IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No.   03-cv-00636-WDM-KLM

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

C. JONES & COMPANY,
CARTER ALLEN JONES,
TIMOTHY J. MILES,
GAYLEN P. JOHNSON AND
JONATHAN CURSHEN,

      Defendants
_____

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDERS
CONCERNING THE DEFENDANT TIMOTHY J. MILES**
_____


      The claims in this proceeding against the Defendant Timothy J. Miles

("Defendant" or "Miles") were separately tried to me on June 20 and 21, 2005.

Subsequent to trial the parties each submitted authority whether I should take judicial

notice of the publicly quoted price for relevant stock.  After due consideration of each

party's argument, I take judicial notice of the relevant quoted prices and volumes

pursuant to Fed. R. Evid. 201.  *See* Ex. 28.  Judicial notice of publicly traded stock is

well recognized.  *See Ganino v. Citizens Utility Co.*, 228 F.3d 154, 167 n. 8 (2nd Cir.

2000).  This recognition includes internet publications such as Exhibit 28.  *In re NAHC,

Inc.  Sec. Litig.,* 306 F.3d 1314, 1331 (3d Cir. 2002).

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") asserts that Miles violated the following federal securities laws: (1) fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 ("Count I"); (2) fraud in violation of Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") ("Count II") ; and (3) fraud in violation of Section 17(a)(2) and (3) of the Securities Act ("Count III").  The Commission seeks a permanent injunction enjoining Miles from violating federal securities laws, a penny stock bar, disgorgement, prejudgment interest and a civil penalty.

Following trial and full review of the record, I make the following findings of fact and conclusions of law and enter the following orders:

<u>FINDINGS OF FACT</u>

The following factual statements have either been stipulated or proved by a preponderance of the evidence:

1.  Defendant is a businessman with extensive experience in the securities industry, including assistance to start-up and micro-cap companies in creating public markets for their stock.

2.  From 1988 through at least 1993, Defendant held Series 7 and 63 or 64 securities licenses and worked for two brokerage firms, specializing in smaller companies quoted on the NASDAQ, the Over-the-Counter Bulletin Board ("Bulletin Board") and the Pink Sheets.

3.  In 1993, Defendant founded a company called Pratt Wylce & Lords ("PW&L"), which provided investment banking and business consulting services to start-up companies to help them go public.  Defendant was the president of PW&L and ran its

day-to-day operations until they ceased in January 1997.

4. Defendant registered PW&L with the Commission as an investment company pursuant to the Investment Company Act of 1940 and, using Olsen Payne & Co. of Salt Lake City, Utah, ("Olsen Payne") as the market-maker, arranged for PW&L to be publicly traded on the Bulletin Board.

5. Defendants solicited at least 16 investors in PW&L by calling up friends, acquaintances and former brokerage clients.

6. A way for a company to have its stock price quoted on the Bulletin Board is for a market-maker such as Olsen Payne to obtain National Association of Securities Dealers ("NASD")[1] approval of a Form 211 application filed pursuant to Securities Exchange Act Rule 15c2-11.

7. The market-maker must submit to the NASD in its Form 211 information about the issuer that the market-maker believes is accurate and reliable before the NASD allows the market-maker to quote the stock. If the NASD clears the Form 211, the market-maker must make the form available to potential buyers of the company's stock for their inspection.

8. While operating PW&L Miles assisted at least three companies become publically traded by working with Olsen Payne to file an appropriate Form 211 application with the NASD.

9. In late 1998, Defendant formed a corporation known as Auric Enterprises, Inc. ("Auric"). Its only assets were mining claims of limited value.

_____

[1]NASD is now the Financial Industry Regulatory Authority ("FINRA").

10. Defendants' real plan was to merge with another private company and have the merged company become publically traded.

11. Defendant decided to raise money by selling shares to investors he selected and solicited. His investors were relatives, friends and former clients, including those who invested in PW&L.

12. To become a shareholder, each Auric investor was required to sign a subscription agreement which, among other things, included the investor's address.

13. Defendant requested that several Auric shareholders put down false addresses on their subscription agreement because they resided in states such as California whose Blue Sky Laws prohibited the stock offer without registration or other approval.

14. There is evidence that Miles claimed that Auric's attorney, Jody Walker ("Walker") told him it was legal for investors in Blue Sky states to drive to neighboring states where a private offering could be lawfully sold to buy the stock. Walker has no recollection of being asked that question and in any case opined that such action would not be legal.

15. Miles told one investor, Paul Spiegler, to falsely state on his subscription agreement that Spiegler had sufficient income, net worth and/or investment sophistication to be an accredited investor when in fact he was not.

16. Defendant registered Auric's common stock with the Commission in April 1999, with the filing of a Registration Statement on Form 10SB and subsequent amendments thereto to reflect current developments.

17. The Forms 10SB disclosed that Defendant owned more than 52% of the

outstanding common stock and more than 64% of its warrants, indicating that he owned "controlling ownership" of Auric.

18.  Defendant installed acquaintances and relatives as officers and directors of Auric.

19.  Defendant prepared a consulting agreement with Auric which compensated him with Auric stock.

20.  Although he was neither an officer or director, Defendant effectively made all decisions for Auric.

21.  Defendant arranged to have Olsen Payne file a Form 211 application with NASD to permit quotation of Auric's common stock on the Bulletin Board.

22.  Defendant was responsible for providing Olsen Payne all information concerning Auric, including its shareholder list which contained the false addresses from the subscription agreements.  Olsen Payne was unaware of any falsity.

23.  The application was filed in August 1999 (Ex. 7), and referred to the Over-the-Counter ("OTC") Compliance Unit for review.

24.  After review of the Auric Form 211, OTC compliance examiner Robert Nesbitt ("Nesbitt") sent Olsen Payne a letter on August 26, 1999 stating the application was deficient and asking several questions about Auric, including more information about Defendant, who solicited the investors, the investors' relationship to Auric and each other and the number of shares owned by various investors.  *See* Exhibit 8.

25.  Olsen Payne sent the Nesbitt letter to Defendant to assemble the information to respond.

26.  As part of the response, Defendant prepared a two-page list of shareholders

that falsely described their relationships to one another. Rather than disclosing that many shareholders invested in Auric because of their relationship to Defendant, he falsely stated that investors were friends of other Auric shareholders.

27. By letter dated September 9, 1999, Defendant caused this false information, together with copies of the subscription agreements with false addresses, to be sent to Olsen Payne which in turn forwarded the same to Mr. Nesbitt by letter dated September 13, 1999. *See* Exhibit 9. This transmittal included lists of shareholders and warrant holders which disclosed that Defendant owned "controlling interest" in each. Exhibits E and F attached to Exhibit 9.

28. Representatives of Olsen Payne were unaware that the materials it submitted to Mr. Nesbitt contained those falsities.

29. Defendant knew providing false information was wrong but did so because he was frustrated with the delay in processing the Form 211 applications and feared further delay if the NASD had concerns with the extent of his control.

30. Had Olsen Payne been aware of the false information submitted by Defendant it would have withdrawn Auric's Form 211 application to the NASD.

31. Had Nesbitt been aware that the original application and information later supplied may have been false, he would have contacted Olsen Payne to clarify or obtain accurate information and, if Olsen Payne insisted on proceeding with the application as it was, Nesbitt would likely have contacted NASD's fraud unit and the Commission to alert them of a potentially fraudulent Form 211 application. He would not have cleared the application for trading on the Bulletin Board.

32. Unaware of the false statements on the Form 211 application or materials

submitted in support thereof, the NASD cleared Olsen Payne's application to submit quotations on Auric's common stock to the Bulletin Board on November 8, 1999.

33.  On December 10, 1999, Olsen Payne applied to submit quotations on Auric's common stock to the Bulletin Board which was approved by NASD four days later.

34.  During this time Miles had been seeking merger candidates for Auric and ultimately agreed in mid-November 1999, to merge with Freedom Golf, a private company that made golf clubs and other equipment, which was in financial distress.

35.  Defendant's 885,000 shares of restricted Auric stock became free-trading Freedom Golf shares.

36.  Upon Defendant's recommendation, Carter Allen Jones ("Jones") and Jonathan Curshen ("Curshen") were retained to promote Freedom Golf's stock in exchange for warrants to purchase Freedom Golf's stock.

37.  Promotional materials prepared by Jones and Curshen contained false information of which Defendant may have been aware.  By various orders, I have previously determined by default that Jones materially misrepresented information concerning Freedom Golf, enjoined him, ordered disgorgement and imposed a civil penalty.  See orders dated January 22, 2004, March 31, 2005 and January 31, 2006 (Doc. nos. 42, 112 and 167).

38.  Between December 1999 and October 2000, Freedom Golf's stock price and volume increased dramatically.  The price jumped from $.40 a share to almost $2.00 while the volume of shares traded increased to hundreds of thousands of shares a day.

39.  During this time period Miles sold 387,550 shares of Freedom Golf stock

realizing cash proceeds of $267,550.

40.  Defendant has not been in the stock promotion business since 2000 and disclaimed any intent of returning to the business.

41.  Until May 2005, Defendant was engaged in writing and marketing a web-based newsletter exposing fraud in micro-cap public companies at www.our-street.com. As part of this business Defendant advised the SEC of possible security fraud of several different public companies which led to SEC investigations and actual suspension of trading in at least two of the companies.

CONCLUSIONS OF LAW

1.  I have jurisdiction over this matter and the defendant under § 22(a) of the Securities Act, 15 U.S.C. § 77u(a), and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

2.  The Commission asserts that Defendant violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder as well as § 17(a) of the Securities Act.  The elements of proof for these two claims are essentially the same: (1) material misrepresentation, (2) in connection with the purchase or sale of a security, (3) *scienter*, and (4) use of jurisdictional means.  *See Geman v. SEC*, 334 F.3d 1183, 1192 (10th Cir. 2003) (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363 (9th Cir. 1993)); *SEC v. C. ones & Co.*, 312 F.Supp. 2nd 1375, 1379 (D.Colo. 2004).  Under § 17(a)(2) & (3), the elements are identical except the SEC need show only negligence instead of *scienter*. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

3.  The focus of the parties' legal debate concerning these elements have been the issue of materiality and connectivity.

4.  Beginning with the issue of misrepresentation, there is no dispute that, in connection with Auric's § 211 application, Defendant misrepresented shareholder addresses, the relationship of the shareholders *inter se*, particularly in relation to the Defendant, and in at least one instance the qualification of a shareholder to purchase unregistered stock.  The issue is whether these misrepresentations were material within the meaning of liability under either the Exchange Act or the Securities Act.

5.  A statement is material "if a reasonable investor would consider it important in determining whether to buy or sell stock."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Materiality is a fact-specific inquiry.  *Id.* at 1118.  The test is objective: Is there a substantial likelihood that the misinformation would be significant to a reasonable investor.  *TSC Indus., Inc.,* 426 U.S. at 445, 449.

6.  The Plaintiff has pled, argued and presented evidence that, had the true facts been disclosed during the Form 211 application to the NASD, the Auric stock would not have been cleared to trade on the Bulletin Board, and, accordingly, the misrepresentations are material.  Plaintiff, however, cites no authority for such a "but for" analysis of materiality and such reasoning completely disregards the reasonable investor standard.

7.  Likewise, Plaintiff cites no authority for a *per se* rule that deems the use of false information in a Form 211 application a material misrepresentation in violation of the Securities or Exchange Act.  To be actionable, the statements must be "*misleading* as to a *material* fact.  It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."  *Basic Inc. v. Levinson*, 485 U.S. 224,

9

238 (1988) (emphasis in original).

8.  Plaintiff presents a variation of the "but for" argument by relying on *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330 (10th Cir. 1983), which states that a purchaser should be able to assume that a regulated security was lawfully issued. *Id.* at 1333. The case, however, addresses unrelated issues of fraud on the market and is inapposite to the issue of materiality of misrepresentations to a reasonable investor.

9.  The issue remains whether the admitted false information would be significant to the reasonable investor. It is a mixed question of law and fact. *TSC Indus., Inc.,* 426 U.S. at 450. Here, the evidence on the issue is at best sparse. Plaintiff has presented no direct or opinion evidence of the significance to a reasonable investor of the misrepresentations in the Form 211 application. There is no dispute that a careful, reasonable investor had access to these misrepresentations. It is also undisputed that the same investor had access to the Form 10SB disclosures showing that Defendant had controlling ownership of Auric.

10.  Plaintiff argues that, if the true addresses of the shareholders had been disclosed, a reasonable investor would not want to invest in a company when its existing shareholders may have potentially violated the Blue Sky Laws of the state of their true residence. I reject this argument as there is no evidence that the "reasonable investor" would seek such information or have the legal sophistication to judge such status. As to the false description of relationships among the shareholders, Plaintiff makes a similar argument that there could be an issue of whether a legal distribution of shares under § 5 of the Securities Act had been made. Again, there is no evidence that

a reasonable investor would have such legal sophistication when considering whether to buy or sell the stock. To the extent that Plaintiff's case rests upon the false information concealing the Defendant's influence or control, the reality of the disclosure of his control on the Auric's Form 10SB undercuts such an argument.

11. When considering the misrepresentations in the context of the total "mix" of information available to the reasonable shareholder, I conclude that Plaintiff has failed to prove by a preponderance of the evidence that there is a substantial likelihood that the true addresses and relationships would have assumed actual significance in that shareholder's deliberations. *TSC Indus., Inc.,* 426 U.S. at 449. Plaintiff, therefore, has failed to prove that the misrepresentations were material.

12. Given this failure of proof of materiality, I will not address the remaining issues.

Accordingly, it is ordered:

1. The complaint against Defendant Timothy Miles is dismissed with prejudice;

2. Given that this ruling resolves all issues concerning Defendant Miles, there is no just reason for delay and final judgment should enter in his favor dismissing Plaintiff's claims against him pursuant to Fed. R. Civ. P. 54(b); and

3. Defendant Miles may have his costs.

DATED at Denver, Colorado, on February 10, 2009.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge