IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No.  03-cv-00636-WDM-KLM

SECURITIES AND EXCHANGE COMMISSION,

 Plaintiff,

v.

C. JONES & COMPANY,
CARTER ALLEN JONES,
TIMOTHY J. MILES,
GAYLEN P. JOHNSON AND
JONATHAN CURSHEN,

 Defendants
_____

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDERS
CONCERNING THE DEFENDANT JONATHAN CURSHEN**
_____

  The claims in this proceeding against the Defendant Jonathan Curshen ("Defendant" or "Curshen") were separately tried to me on April 30 and May 1, 2007.

  Plaintiff Securities and Exchange Commission ("SEC" or "Commission") asserts that Curshen violated the following federal securities laws: (1) fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 ("Count I"); (2) fraud in violation of Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") ("Count II"); (3) fraud in violation of Section 17(a)(2) and (3) of the Securities Act ("Count III"); and (4) receipt of undisclosed compensation for stock

1

promotion in violation of Section 17(b) of the Securities Act ("Count IV"). The Commission seeks a permanent injunction enjoining Curshen from violating federal securities laws, a penny stock bar, disgorgement, prejudgment interest and a civil penalty.

Following trial and full review of the record, I make the following findings of fact and conclusions of law and enter the following orders:

## FINDINGS OF FACT

The following factual statements have been proved by a preponderance of the evidence:

1. Except for the Defendant, the witnesses who testified before me were generally credible. Given his demeanor and answers, the Defendant was not fully credible. He repeatedly stated he did not recall matters which were clearly linked to him, such as e-mail communications which were admittedly sent from his computer or under his user name. He also suggested that messages could have been created by other individuals who from time to time used his computer, including his Rabbi. There was no explanation, however, of why his Rabbi or anyone else would be communicating messages concerning potential investments in Freedom Golf. His testimony is in direct conflict with other witnesses who had no self-interest in the particular issue such as Jose Pablo Jimenez ("Jimenez"), and Joseph Fernando ("Fernando"). By use of his passport, Defendant also sought to distance himself from the Internet postings by demonstrating that he frequently traveled to Costa Rica during the early months of 2000. The passport markings, however, did not include dates of his departures from Costa Rica to enable a determination of the length of his stays in Costa Rica.

Accordingly, these efforts were inconclusive at best.

2. Defendant, age 42, is an American and British citizen who has lived and worked in San Jose, Costa Rica, since approximately 1997. He has also maintained an address in Sarasota, Florida, where he also lived and worked.

3. Defendant has worked in various capacities, including as an investment advisor and stock promoter. He has been associated with Red Sea Management ("Red Sea"), a Costa Rican company since approximately 1998.

4. From 1991 through 1999, Defendant owned and operated a privately held corporation called Southern Assurance Group ("Southern Assurance") out of Sarasota, Florida. Initially Southern Assurance sold life and health insurance and annuities. Beginning in 1994, Southern Assurance became involved in helping smaller public and private companies raise money from investors. This included the stock promotion business of helping the companies to publicize their stock to induce investors to purchase it.

5. In late 1998, Timothy Miles ("Miles") formed a corporation known as Auric Enterprises, Inc. ("Auric") whose only assets were mining claims of limited value.

6. Miles was the controlling shareholder and the other shareholders were Miles' relatives and other individuals who had previous dealings with Mr. Miles.

7. Miles registered Auric's common stock with the Securities and Exchange Commission ("Commission") or ("SEC") in April of 1999, with the filing of a registration statement on Form 10SB. This form and all amendments thereto disclosed that Miles owned the majority of the outstanding common stock and warrants, giving him "controlling ownership" of Auric.

8. In August 1999, using Olsen Payne & Co. of Salt Lake City, Utah ("Olsen Payne") as the market-maker, Miles applied to the National Association of Securities Dealers ("NASD")[1] for authority to have Auric stock publicly traded on the Over-the-Counter Bulletin Board ("Bulletin Board") by means of a Form 211 application filed pursuant to the Securities Exchange Act Rule 15c2-11.

9. In December 1999, the NASD cleared Auric stock for quotation on the Bulletin Board.

10. During this time Miles pursued merger candidates and ultimately focused on Freedom Golf, a private company that made custom golf clubs and other equipment.

11. Gaylen Johnson ("Johnson"), a defendant in this proceeding, was the president of Freedom Golf and owned the company along with three other men.

12. Johnson had started the company in December 1996. From its inception through the fall of 1999, Freedom Golf's sales were minimal and the company struggled financially. It stayed in business through loans and issuing new stock but its cash flow was poor and it had difficulty paying suppliers, payroll and all costs of operation. Records indicate that its annual pretax losses were $440,110 in 1998 and $696,532 in 1999.

13. In 1999 Freedom Golf was attempting to find cash to market the company and its products. In doing so, it made its cash problems well known.

14. Miles and Johnson were introduced and entered into merger negotiations, ultimately culminating in a merger agreement between Auric and Freedom Golf in

---

[1] NASD is now Financial Industry Regulatory Authority ("FINRA").

4

November of 1999, which enabled Freedom Golf to become a public company traded on the Bulletin Board in December 1999.

15. Miles and Johnson discussed the need for Freedom Golf to hire a stock promoter and in February 2000 Miles contacted Fernando, a stockbroker in Union Securities in Vancouver, Canada. Fernando recommended Carter Allen Jones and the Defendant.

16. In February 2000, Miles telephoned Curshen to see if he would be interested in being a stock promoter for Freedom Golf. Curshen expressed an interest and subsequent conversations were had between Curshen, Miles and Johnson.

17. At approximately the same time Miles was also in contact with Carter Allen Jones who operated as C. Jones & Co. Jones agreed to help promote the company and was paid by warrants for the purchase of Freedom Golf stock. Jones was aware of Freedom Golf's poor financial condition and the minimal sale of golf clubs.

18. Jones had discussions with the Defendant concerning the promotion of Freedom Golf and was told by Defendant that he had buyers who would follow his recommendation to purchase Freedom Golf stock and drive up the price.

19. Jones also prepared an "investor report" for Freedom Golf on Jones' website. The report made projections for 2000, 2001 and 2002, based upon information provided by Johnson which was speculative at best. The report projected rapidly increasing revenues with profits of $1.6 million in 2000, $4.5 million in 2001 and $13.5 million in 2002. *See* Ex. 6. Johnson opined these numbers were realistic but only if a certain "infomercial" about the golf clubs was produced and marketed. If not, he testified they were not realistic. The "infomercial" was never produced.

20. Jones publicly distributed the investor report for Freedom Golf. Defendant was aware of this publicity but was also advised of Freedom Golf's actual dire financial situation. Defendant made no inquiry as to the legitimacy of projections contained in the investor report but nevertheless made reference to it in public dealings.

21. Defendant agreed to promote Freedom Golf and in exchange Miles compensated him by transferring 125,000 shares of Freedom Golf stock in February and March 2000. The transfer was to an account with Union Securities in the name of Triparoo, S.A., a Costa Rican entity whose stated beneficiary was Barry Ross ("Ross").

22. Although his name was not on the Triparoo account, Defendant exercised control over it. In February, March and April of 2000, Miles transferred the 125,000 shares of Freedom Golf stock into the account and the Triparoo account bought another 57,200 shares for $83,523.13. Over the same time period 158,700 shares of Freedom Golf stock were sold for a total of $211,696.76, leaving a profit from Freedom Golf sales of $128,173.63.

23. The evidence does not support Defendant's arguments that the stock proceeds belong to Ross, that payments thereof to Defendant were repayments for an undocumented loan from Defendant to Ross or otherwise undocumented payment for Ross' real estate purchase. No testimony or other evidence tends to corroborate Defendant's testimony in these regards.

24. The full extent of Defendant's benefit from these transactions is not clear. The funds from the Triparoo account at Union Securities were regularly wired to Surety Bank in the Bahamas, supposedly at the request of Jimenez. Jimenez was an acquaintance of Defendant Curshen and acknowledged that he signed account forms at

Curshen's request but was unaware of any matter concerning Triparoo and did not know that he was the signatory for the brokerage account at Union Securities.

25. The Surety Bank account was in the name of Kahn Noonien Singh Management, LC, but had Curshen's facsimile number on it.

26. Records indicate that, after receipt of the sales proceed from the Triparoo account at Union Securities, Surety Bank wired amounts to either Defendant Curshen individually or to Southern Assurance. On March 9, 2000, Union Securities wired $24,990 to the Surety Bank. On March 10, 2000, Surety Bank wired $5,040 to Defendant and another $16,065 to Southern Assurance on March 16, 2000. On April 7, 2000, Union Security wired $29,990 to the Surety Bank account. Six days later $30,065 was wired from Surety Bank to Southern Assurance. On April 20, Union Securities wired $14,990 to Surety Bank and on April 28 it wired $15,065 to Southern Assurance. See Exs. 2 and 30. Consequently, the Plaintiff has proved at least $66,235 of the net proceeds from the sale of Freedom Golf stock were received by Curshen, directly, or for his benefit through Southern Assurance and it may well have been more.

27. Defendant ordered the buying and selling of Freedom Golf stock for the Triparoo account at Union Securities.

28. As part of the stock promotion program Defendant contacted Orville Baldridge ("Baldridge") to become involved in the stock promotion by doing public relations and caused 10,000 shares of Freedom Golf stock to be transferred to Baldridge as compensation for the work.

29. Defendant posted numerous Internet messages supportive of Freedom Golf stock, expressly or implicitly urging people to buy it. Defendant admitted Savior 1999

was his user name on the Internet website Raging Bull and his messages are contained on Exhibit 5. Similarly, Defendant used the name of BidUp on a website named Deja.com (Exhibit 6) and the username of Savior 4000 on America Online (Exhibit 9). Examples of the puffing type messages include:

> "I hear rumblings that some very powerful investor relations people are going to get involved here."
>
> "Pump up the volume!!"
>
> "Get in now before the fireworks . . ."
>
> "All aboard! This train is pulling out . . ."
>
> "About to leave the launching pad."

30. Defendant's promotional efforts were contemporaneous with his receipt and sale of Freedom Golf stock for his benefit.

31. Defendant's actions and omissions were knowingly made.

## Conclusions of Law

1. I have jurisdiction over this matter and the Defendant under § 22(a) of the Securities Act, 15 U.S.C. § 77u(a), and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

2. In its first two claims for relief ("Counts I and II") the Commission asserts that Defendant violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder as well as § 17(a) of the Securities Act. The elements of proof for these two claims are essentially the same: (1) material misrepresentation, (2) in connection with the purchase or sale of a security, (3) *scienter*, and (4) use of jurisdictional means. *See Geman v. SEC*, 334 F.3d 1183, 1192 (10th Cir. 2003) (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363 (9th Cir. 1993)); *SEC v. C. Jones & Co.*, 312 F.Supp. 2d 1375, 1379 (D. Colo.

2004). In its third claim for relief ("Count III") under § 17(a)(2) & (3), the elements are identical except the SEC need show only negligence instead of *scienter*. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

    3. The focus of the parties' legal debate concerning these elements has been whether there was a misrepresentation and, if so, whether it was material. There is apparently no dispute that Plaintiff has proved connectivity and use of jurisdictional means.

    4. A statement is material "if a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Materiality is a fact-specific inquiry. *Id.* at 1118. The test is objective: Is there a substantial likelihood that the misinformation would be significant to a reasonable investor? *TSC Indus., Inc.,* 426 U.S. at 445, 449.

    5. Plaintiff asserts Defendant made material misrepresentations in its public actions concerning Freedom Golf by failing to disclose that he was not a disinterested observer, but rather hired to promote Freedom Golf, he was paid for his promotional activities and he was selling his shares while encouraging the public to purchase the stock. Plaintiff also alleges that Defendant's reference to the investor report, which he knew or recklessly didn't know was baseless, was also a misrepresentation.

    6. Defendant has factually disputed that he received Freedom Golf stock as compensation, that he benefitted from the sale of the stock, that the e-mails were false, that he even issued them or that he acted with intent. As indicated, however, I generally find otherwise.

7. In addition, Defendant argues that the information presented or omitted by Defendant was not material because it merely reflects corporate optimism for the future which is not actionable. *Grossman*, 120 F.3d at 1119. A material misrepresentation has to significantly alter the "total mix" of information available. *TSC Indus., Inc.,* 426 U.S. at 449.

8. In resolving these matters, I first observe that failing to disclose material information is actionable. *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985). *SEC v. Huttoe*, Civil Action No. 96-2543(GK)1998 WL 34078092 (D.D.C. Sept. 14, 1998).

9. I also conclude that the reasonable investor would consider it important whether to buy or sell stock that the individual promoting the sale was being compensated for the promotion and is selling the same stock for his own benefit. *See SEC v. Huttoe* at *4. The omissions are therefore material.

10. I also conclude that financial projections are matters a reasonable investor would consider. *SEC v. Blavin*, 557 F.Supp. 1304, 1313 (E.D.Mich. 1983). Defendant knew the dire financial position of Freedom Golf and either knew, or recklessly didn't know, that the published investor report was essentially baseless because there was a "gross disparity" between Freedom Golf's financial reality and the unrealistic financial prediction based upon a non-existent "infomercial." *See Cutsforth v. Renschler*, 235 F.Supp. 2d 1216, 1231 (M.D. Fla. 2002); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). Therefore, the report was a material misrepresentation as were Defendant's references to it.

11. Defendant's actions were with knowing intent to manipulate a market for his own benefit or with severe reckless disregard to the investing public and hence acted

with *scienter* as required by the Exchange and Securities Acts. Certainly, Defendant's acts and omissions in this regard were negligent in violation of § 17(a)(2) & (3).

12. Accordingly, I conclude that Defendant is liable under the first three claims for relief (or "Counts I, II and III") as having violated the stated sections of the Securities and Exchange Acts.

13. In its fourth claim for relief ("Count IV") the Commission asserts that the Defendant violated § 17(b) of the Securities Act. This section requires stock promoters to fully disclose their compensation. The elements of the claim are: (1) publication of communication concerning a security; (2) failure to disclose compensation received; and (3) use of interstate commerce. *See SEC v. Gorsek*, 222 F.Supp. 2d 1099, 1105 (C.D. Ill. 2001); *SEC v. Liberty Capital Group, Inc.*, 75 F.Supp. 2d 1160, 1163 (W.D. Wash. 1999) (*scienter* not an element). The Defendant's internet messages touting Freedom Golf violated § 17(b) because of his failure to disclose his compensation.

14. With these conclusions of violations, I turn to what remedies should be awarded. The SEC seeks a permanent injunction against the Defendant from violating any securities laws, an injunction permanently barring the Defendant from participating in a penny stock offering, disgorgement, with prejudgment interest, and a civil penalty to be awarded post-judgment.

15. Turning first to the permanent injunction, an injunction based on violations of securities law is proper when the SEC demonstrates a reasonable likelihood that the Defendant will violate those laws in the future. *SEC v. Pros Int'l., Inc.*, 994 F.2d 767, 769 (10th Cir. 1993). Factors to consider whether a permanent injunction is appropriate

are: (1) how egregious were Defendant's actions; (2) degree of *scienter*; (3) Defendant's recognition of the wrongful nature of his conduct; (4) sincerity of Defendant's assurances against future violations; and (5) likelihood that Defendant's occupation will present opportunities for future violations. *Id.*

16. Defendant argues that there should be no injunctive relief because Defendant's activity was not egregious as the Internet is not likely to influence reasonable investors, there was no evidence that Defendant engaged in similar activity or acted with fraudulent intent and he is unlikely to present opportunities for similar future violations given his current occupation, claimed not to involve dealings with public securities. Even assuming that the Defendant never engaged in similar activity and it is unlikely that his present or future occupation will involve publicly traded securities, my consideration of the factors nevertheless weighs in favor of an injunction. The non-disclosure of the Defendant's personal interest as the stock promoter and trader is of vital importance to any investor relying upon Defendant's actions and the concealment was of an egregious nature over a several week period. His complete failure to disclose his self-interest is strong circumstantial evidence of intentional conduct. Similarly, giving credence to a fabricated financial report is at best reckless. I note that Defendant has a history of being involved with stock promotion and stock trading which bespeaks some likelihood of future trading even if his current employment actually precludes it, which is not established on the record. Defendant does not recognize any wrong-doing, indeed denies it or declares the inability to recall it. Given that history and attitude, I do not accept Defendant's assurances against future violations or that there is no likelihood that he will have the opportunity to engage in similar conduct. I also note that he was

not a fully credible witness and his assurances are given little if any weight.  Accordingly a permanent injunction should enter.

17. A penny stock bar may be issued if a person has been enjoined with regard to the purchase or sale of a security that included a penny stock offering and the bar is in the public interest.  Section 15(b)(6)(A) of the Exchange Act (15 U.S.C. § 78o(b)(6)(A); 15 U.S.C. § 78u(d)(6)(A)).  The Act applies to "any person acting as any promoter, finder, consultant, agent, or other person who engages with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock."  Section 15(b)(6)(C) of the Exchange Act (15 U.S.C. § 78o(b)(6)(C); 15 U.S.C. § 78u(d)(6)(B)).

18. There appears to be no dispute that Freedom Golf qualifies as a penny stock and by this order the Defendant is being enjoined with regard to its purchase or sale. There is an issue whether the Defendant was a person participating in the stock offering.  I find and conclude that he did so participate as a promoter and other person engaged with a broker and issuer for purposes of trading in the stock.  Given the circumstances of this case, the public interest will be served by such an injunction. Accordingly, a penny stock bar should issue.

19. With regard to disgorgement, it should be used to deprive the wrong-doer of unjust enrichment and deter others from violating the securities law.  *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989).  However, as I noted in my March 31, 2005 order the SEC must prove some causal connection between an amount Defendant was unjustly enriched and the amount he's required to disgorge.  The burden is not exacting but does require a basis for a reasonable approximation of the profits

causally connected to the violations. *First City Fin. Corp.*, 890 F.2d at 1231-32. I conclude that the SEC met its burden by proving that the trading of Freedom Golf stock resulted in a profit of over $128,000 and proof that at least $66,235 of those net proceeds were paid to Defendant or his benefit through Southern Assurance. Accordingly, disgorgement of $66,235 by Defendant should be ordered.

20. Given that the Defendant has enjoyed the benefit of the funds since the year 2000, he should be required to pay pre-judgment interest in accordance with the equitable purpose of disgorgement. *SEC v. Hughes Capital Corp.*, 917 F.Supp. 1080, 1090 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997).

21. The SEC persists in seeking a civil penalty that requests a determination post-judgment as well as a determination of the amount of pre-judgment interest. Since I will be retaining jurisdiction in this matter such a procedure is acceptable and has been employed both with regard to Defendant Johnson and the Defendant Jones.

Accordingly, it is ORDERED, ADJUDGED AND DECREED as follows:

1. Curshen and his officers, agents, servants, employees, representatives, and all persons in active concert or participation with any of them, directly or indirectly, who receive actual notice of this judgment of permanent injunction, by personal service or otherwise, are, permanently restrained and enjoined from, directly or indirectly, singly or in concert, as aiders and abettors or otherwise, in the offer or sale of any security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails:

> (a) employing any device, scheme or artifice to defraud;
>
> (b) obtaining money or property by means of any untrue statement of

material fact or omission to state any material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; or

(c) engaging in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon purchasers or perspective purchasers of any such security;

in violation of Sections 17(a)(1), 17(a)(2) and 17(a)(3) if the Securities Act of 1933, 15 U.S.C. § 77q(a)(1), 77q(a)(2) and 77q(a)(3).

    2. Curshen, his officers, agents, servants, employees, representatives, and all persons in active concert or participation with any of them, directly or indirectly, who receive actual notice of this judgment of permanent injunction, by personal service or otherwise, are permanently restrained and enjoined from, knowingly and willfully, directly or indirectly, singly or in concert, as aiders and abettors or otherwise, in connection with the purchase or sale of any security, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange:

(a) employing any device, scheme or artifice to defraud;

(b) making any untrue statements of material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person;

in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),

and Rule 10b-5, 17 C.F.R. § 240.10b-5.

3. Curshen, his officers, agents, servants, employees, representatives, and all persons in active concert or participation with any of them, directly or indirectly, who receive actual notice of this judgment of permanent injunction, by personal service or otherwise, are permanently restrained and enjoined from, directly or indirectly, making use of the mails or any means or instrumentality of interstate commerce to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof in violation of Section 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b).

4. Curshen is barred from participating in any penny stock offering in accordance with § 15(b)(6)(A) of the Exchange Act.

5. Judgment shall enter against Defendant Curshen in the amount of $66,235, together with prejudgment interest to be determined as hereafter provided.

6. Final judgment shall enter but I retain jurisdiction in order to implement and carry out the terms of all orders and decrees as well as consider any application or motion for additional relief.

7. The SEC may file request for determination of prejudgment interest and imposition of a civil penalty on or before April 15, 2009. The Defendant may respond on or before May 6, 2009 and the SEC may reply 10 days thereafter. No pleading shall

exceed 10 pages on these issues.

DATED at Denver, Colorado, on March 3, 2009.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge